Albert J. MINICHELLO, Nicholas Mauriello and Ygnatz Yuchnis, on a Derivative Action on Behalf of Themselves and on Behalf of Other Stockholders of the First National Bank of Exeter Similarly Situated, Incorrectly Described in the Summons and Complaint as Albert J. Minichello, Nicholas Mauriello and Ygnatz Yuchnis, Appellants,

v.

James J. SAXON, Comptroller of Currency for the United States of America, First National Bank of Exeter, Wyoming National Bank of Wilkes-Barre, August J. Lippi, Ettore Lippi, John Lippi, John B. Campbell, George Maffei and Harold Reich.

No. 14560.

United States Court of Appeals
Third Circuit.

Argued April 15, 1964.

Decided Sept. 18, 1964.

Rehearing Denied Nov. 3, 1964.

Anthony C. Falvello, Hazleton, Pa. (Arthur D. Dalessandro, Wilkes-Barre, Pa., Joseph J. Ustynoski, Conrad A. Falvello, Hazleton, Pa., on the brief), for appellants.

Charles A. Shea, Jr., Wilkes-Barre, Pa., for Wyoming Nat. Bank of Wilkes-Barre.

Thomas F. Gill, Wilkes-Barre, Pa., for First Nat. Bank of Exeter and individual directors.

Morton Hollander, Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., Bernard J. Brown, U. S. Atty., Terence N. Doyle, Atty., Dept. of Justice, Washington, D. C., on the brief), for Saxon, Comptroller, etc.

Before BIGGS, Chief Judge, HASTIE, Circuit Judge, and KIRKPATRICK, District Judge.

BIGGS, Chief Judge.

This is a derivative shareholders' action to invalidate a sale of assets of the First National Bank of Exeter ("Exeter bank") to the Wyoming National Bank of Wilkes-Barre ("Wyoming bank"). Plaintiffs are minority shareholders of the Exeter bank. Defendants are the Exeter bank and various members of its board of directors, the Wyoming bank and the Comptroller of the Currency. The plaintiffs have appealed from an order of the court below entered on July 2, 1962 dismissing the action as against the Comptroller and an order of dismissal as against all other defendants entered on July 12, 1963.

The case was tried to the court below without a jury. The essential facts are not in dispute. On or about January 29, 1962 a defalcation of approximately $200,000 was discovered at the Exeter bank. As an audit of the bank progressed the shortage was found to exceed $400,000. Between January 29, 1962 and February 19, 1962, the Comptroller urged that there be a reorganization or a sale of the bank. No progress having been made in respect to either, on February 19, 1962, pursuant to Section 203, 12 U.S. C.A., the Comptroller appointed a conservator for the Exeter bank.

On the morning of February 26, 1962 the Wyoming bank offered to assume all the liabilities of the Exeter bank, except its liabilities to its shareholders, accept all its assets and pay a premium of $120,-000. plus 40% of any recovery on its excess bond. Outstanding at this time, among other offers which need not be detailed, was a purchase offer submitted by the First National Bank of Pittston ("Pittston bank"). This offer was to assume stated liabilities, purchase acceptable assets to cover those liabilities, and pay a premium of $186,500. The Pittston bank proposal was subject to the condition that "the net value of assets over liabilities, plus the premium, will be held in escrow for a period of six months, out of which losses not covered by * * * [Exeter's] primary and excess bonds and claims against undisclosed shortages may be charged."

At a special meeting of the board of directors of the Exeter bank on the morning of February 26, 1962, the offer of the Wyoming bank was accepted by six directors voting in favor and three not voting.[1] At a special meeting of the board of directors of the Wyoming bank on the afternoon of the same day, the action of the officers of the Wyoming bank in making the stated offer was approved unanimously. The nine directors of the Exeter bank who had held their

---

1. Ten directors constituted the board of directors of the Exeter bank.

own meeting that morning, attended the directors' meeting of the Wyoming bank and none of them expressed any disagreement with the action taken.

On February 26, 1962 the following telegram dated 6:14 P.M., E.S.T., was sent by the Comptroller to the Exeter bank: "I am now satisfied that it would be in the public interest to terminate the conservatorship of the First National Bank of Exeter and that it may safely be done. Therefore I do hereby terminate the * * * conservatorship, effective February 26 1962, at which time the assets of the bank and the control of its affairs will be returned to its Board of Directors for the purpose of executing a sale of all of the assets of the bank to the Wyoming National Bank of Wilkes-Barre. Pursuant to Section 5220 United States Revised Statutes [12 U.S.C.A. § 181], I have determined that an emergency exists and hereby waive the requirement for shareholder approval of the purchase and sale agreement."

The purchase and sale agreement was executed by the proper officers of both banks late on the afternoon of February 26, 1962. It is not clear from the record at what time the contract was executed and whether the execution was accomplished before or after receipt of the Comptroller's telegram. The agreement was subsequently approved by the Comptroller pursuant to 12 U.S.C.A. § 1828(c).

At a meeting of the board of directors of the Exeter bank held on March 26, 1962, the purchase and sale agreement dated February 26, 1962 was confirmed by six directors voting in favor of the confirming resolution. Three directors voted against it.

In the court below the appellants challenged the validity of the contract of purchase and sale between the Exeter and Wyoming banks.[2] The appellants attempted to support their position on several grounds the most basic of which were that the Wyoming offer was not the best offer received by the Exeter bank and

that the Exeter board of directors breached their fiduciary duty in accepting it, that in any event the Exeter directors did not have authority to accept the Wyoming offer on February 26, 1962 because a conservator was in charge of the affairs of the Exeter bank at that time, that the contract was not executed in compliance with national banking law, and that the Comptroller abused his discretion and acted contrary to law in several respects all of which served to invalidate the contract.

■ The court below granted the Comptroller's motion to dismiss the complaint as to him because the court was of the view that the Comptroller's discretion was exclusive and non-reviewable as to all questions raised in the complaint relating to him. An appeal was taken by the present appellants from the order of dismissal, but that appeal was properly dismissed on the ground that the appeal was not from a reviewable or appealable judgment under 28 U.S.C. Section 1291.[3] After the trial of the case against the remaining defendants the court below concluded that the Wyoming offer was the best offer received by the Exeter bank, that the defendant Exeter directors had breached no fiduciary duty in voting to accept the Wyoming offer, and that the agreement entered into between the Exeter and Wyoming banks was a valid contract.

■ The appellants have now appealed from the orders dismissing the complaint as to the Comptroller and also as to all the other defendants. The appellants challenge all the findings of the court below. They first assert that the Pittston rather than the Wyoming proposal was the best offer received by the Exeter bank for the sale of its assets. We see no valid basis for disturbing the court below's finding on this point. Our conclusion in this regard disposes a fortiori of the appellants' contention respecting the alleged breach of a fiduciary duty on the part of the Exeter directors.

2. No question of contract interpretation arises in the instant case.

3. The order was entered on October 17, 1962, at our No. 14,175.

In view of the indefinite nature of some of its terms, it is questionable whether the Pittston offer was capable of a binding acceptance. In any event, the conditioning clause of the Pittston offer contemplated that "claims against undisclosed shortages" were to be charged against the escrow amount. It was well within the realm of possibility that subsequently disclosed shortages could serve to exhaust or at least substantially minimize the amount due the Exeter bank. On the other hand the Wyoming offer was definite and guaranteed the Exeter bank a minimum consideration. Under these circumstances it certainly cannot be flatly stated that the Pittston offer was preferable to that of the Wyoming bank. The decision as to which offer was the more satisfactory lay within the sound business discretion of the Exeter directors.[4]

The appellants next challenge the court below's conclusion respecting the validity of the contract entered into between the Exeter and Wyoming banks. Their attack is based on several grounds. It is first contended that the Exeter directors did not have the power or authority to accept the Wyoming offer on the morning of February 26, 1962 because at that time a conservator was officially in charge of the affairs of the Exeter bank. In our view even assuming the substance of their statement to be meritorious it does not follow that the purchase and sale agreement was without effect.

The Exeter directors' acceptance of the Wyoming offer and presumably the actual signing of the agreement by the Exeter officers, took place prior to the termination of the conservatorship. But as the appellants themselves asserted in their complaint in the court below, "on February 26, 1962 the Wyoming National Bank of Wilkes-Barre, through its agents, servants and employees, took over complete operation of the First National Bank of Exeter." After termination of the conservatorship both parties to the contract acted in a manner entirely consistent with the agreement and indeed proceeded to start to carry out its terms. Moreover, on March 26, 1962, as we have said, the contract was formally approved by the Exeter directors by a vote of six to three.

On the basis of these facts, it could be validly concluded either that by their actions subsequent to the termination of the conservatorship the Exeter directors manifested their acceptance of the Wyoming offer or that in view of the reliance demonstrated by the Wyoming bank with respect to the agreement, the Exeter bank is estopped from denying the contract's validity on the technical ground urged here. We think the events which took place subsequent to February 26, 1962 serve to render moot any question concerning the possible incapacity or disability of the Exeter directors and officers to enter into the instant contract while the conservatorship was still in operation.

The appellants next contend that the purchase and sale agreement was invalid because the Comptroller had no power to terminate the conservatorship of the Exeter bank solely for the purpose of the execution of the sale agreement. Section 205, 12 U.S.C.A. provides as follows: "If the Comptroller of the Currency becomes satisfied that it may safely be done and that it would be in the public interest, he may, in his discretion, terminate the conservatorship and permit such bank to resume the transaction of its business subject to such terms, conditions, restrictions and limitations as he may prescribe." The appellants argue that Section 205 must be read to the effect that the Comptroller is empowered to terminate a conservatorship of a national bank only for the purpose of enabling it to resume its normal every-day business. In our view while this issue is not necessarily a difficult one, under the

4. There is no proof other than that which tends to show that the financial interest of the majority directors of the Exeter bank was coincidental with the appellants' own best interest, i. e., to make the most advantageous arrangement possible.

facts and circumstances of this case no decision on the question is necessary.

█ It is unquestioned that at all pertinent times, the majority of the Exeter directors were in favor of accepting the Wyoming offer. They in fact purported to accept the Wyoming offer prior to receipt of the Comptroller's telegram and in a fundamental sense the telegram simply manifested approval of their action. We have previously concluded in this opinion that the Exeter directors' favorable inclination towards the Wyoming offer at all pertinent times, in no way serves to demonstrate a breach of fiduciary duty on their part. We are of the view that the appellants have not shown a sufficient causal relation between the Comptroller's order and the execution of the contract in question to give them the requisite standing to attack that order here. The appellants' alleged grievances against the Comptroller directly relate to other considerations which we will now discuss.

The appellants challenge the validity of the contract on the ground that prior to its execution there had not been a vote in favor of liquidation by the Exeter shareholders owning two-thirds of the bank's stock. While the court below made no finding of fact on the point, it appears from the record that the matter of voluntary liquidation was not submitted to the Exeter shareholders until April 26, 1964 at which time the motion in favor of liquidation received majority support but not the necessary two-thirds vote of approval.

Section 181, 12 U.S.C.A., provides in pertinent part as follows: "Any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock. If the liquidation is to be effected in whole or in part through the sale of any of its assets to and the assumption of its deposit liabilities by another bank, the purchase and sale agreement must also be approved by its shareholders owning two-thirds of its stock unless an emergency exists and the

Comptroller of the Currency specifically waives such requirement for shareholder approval." [5] The first sentence has been the law since June 3, 1864. See 13 Stat. 112 (1866). The second sentence is a recent amendment added to the section on September 8, 1959, 73 Stat. 458.

The House Committee on Banking and Currency in its report to the House concerning the 1959 amendment stated the following: "Section 15 [of H.R.8159, 86th Cong., 1st Sess. (1959)] provides that if a liquidation of a national bank is to be effected through the sale of any of its assets to another bank in consideration of an assumption of its liabilities, the approval of the purchase and sale agreement by shareholders owning two-thirds of the bank's stock must be obtained. While the voluntary liquidation must be so approved under existing law, and while it has been the policy of the Comptroller of the Currency to require that the shareholders also approve the purchase and sale agreement, it is believed that there should be a statutory requirement of such approval. The Comptroller of the Currency may waive this requirement for shareholder approval if an emergency exists." H.R.Rep. No. 694, 86th Cong., 1st Sess. 3 (1959).

The corresponding report of the Senate Committee on Banking and Currency to the Senate explained the purpose of the new requirement respecting shareholder approval as follows: "Section 15 would amend Revised Statutes, section 5220 (12 U.S.C. 181), relating to the liquidation of national banks, by adding a requirement that shareholders must approve a purchase and sale agreement if any part of the liquidation is to be accomplished by the sale of any of the bank's assets, but excusing the need for such a vote if in an emergency the Comptroller specifically waives it. Existing law does not require shareholder approval of any agreement the directors may make for a bulk sale of bank assets to another bank as a preliminary step to voting the selling bank into voluntary liquidation. This new provision would provide for a share-

---

5. It is unquestioned that Section 181 is applicable to the case at bar.

holder vote in such cases, except in emergencies. Substantially the same amendment was included in the Financial Institutions Act: Title 1, section 58(a) (p. 50)." [6] S.Rep.No.730, 86th Cong., 1st Sess. 4–5 (1959), U.S.Code Cong. & Admin.News 1959, p. 2232.

6. For reasons not pertinent here the Financial Institutions Act did not become law. Section 58(a) of Title I of the act provided as follows: "Any national banking association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock. If the liquidation is to be effected in whole or in part through the sale of its assets to and the assumption of its deposit liabilities by another bank, the purchase and sale agreement must also be approved by its shareholders owning two-thirds of its stock unless an emergency exists and the Comptroller specifically waves [sic] such requirement for shareholder approval."

Section 58(a) was based at least in part on the following recommendation made by the Comptroller of the Currency, Mr. Gidney, to the Senate Committee on Banking and Currency: "It is recommended that section 5220 of the Revised Statutes [12 U.S.C.A. § 181] be amended to require approval by shareholders owning two-thirds of the stock of any national bank before the assets of said bank may be sold to another banking institution in carrying out the liquidation of the selling bank." The reason for the suggestion was that "section 5220 now requires shareholder approval of any vote to place a national bank in voluntary liquidation but does not require shareholder approval of any agreement entered into by the directors relating to a bulk sale of the bank's assets to another banking institution as a preliminary step to voting the bank into voluntary liquidation. In order to permit shareholders to have a vote on the vital question of selling the bank's assets it is believed the statute should be amended so as to require preliminary approval of the sale by shareholders owning two-thirds of the stock of the national bank."

Hearings to Consider the Legislative Recommendations of the Federal Supervisory Agencies Before the Senate Committee on Banking and Currency, 84th Cong., 2nd Sess., pt. 1, at 44 (1956). See Hearings on Financial Institutions Act of 1957 Before a Subcommittee of the Senate Committee on Banking and Currency, 85th Cong., 1st Sess., pt. 2, at 457 (1957).

The reason for the exception in the case of emergencies does not clearly appear but it is sufficiently obvious that its raison d'être was that for practical considerations it was thought desirable that the shareholder vote be dispensed with in urgent circumstances. [7]

Before the House Committee on Banking and Currency, the Comptroller stated: "Under present law shareholder's approval is not required for a bulk sale of the bank's assets to another bank as a preliminary step to placing the bank into voluntary liquidation.

"The Comptroller has insisted that shareholders vote on and approve such transactions, but we believe the shareholders should have a statutory right to vote on the vital question of selling the bank's assets." Hearings on Financial Institutions Act of 1957 Before the House Committee on Banking and Currency, 85th Cong., 1st Sess., pt. 1, at 162 (1957).

7. Speaking before a Subcommittee of the House Committee on Banking and Currency, Mr. Wolcott, the Chairman of the Federal Deposit Insurance Corporation, stated: "Section 16 of H.R. 6093 [later superseded by H.R. 8159 which was subsequently enacted as the 1959 amendment] would require approval by shareholders owning two-thirds of the stock of any national bank if its 'liquidation is to be effected in whole or in part through the sale of its assets to and the assumption of its deposit liabilities by another bank,' unless an emergency exists and the Comptroller specifically waives such requirement for shareholder approval.

"In City National Bank of Huron, S. D. v. Fuller, (52 F.(2d) 870 (8th Cir., 1931)), it was said that the directors may sell all the assets of a national bank where it is necessary for the protection of creditors in view of its approaching insolvency.

"The proposed authority of the Comptroller to waive the requirement for shareholder approval is necessary and proper, we believe, to protect the Corporation from delays in rendering financial assistance to national banks in emergency situations. However, it is suggested that the words 'sale of its assets' be changed to the words 'sale of any of its assets' to avoid any implication that such provision is only applicable to the sale of all its assets." Hearings on H.R. 6092 and H.R. 6093 Before Subcommittee No. 2 of the House Committee on Banking and Currency, 86th Cong., 1st Sess. 39 (1959).

82

■ It is plain from the face of the statute and the report to the House of Representatives that in order to effect a voluntary liquidation, Section 181 contemplates two distinct shareholder votes in the circumstance at bar: one respecting voluntary liquidation as such and the other concerning approval of the purchase and sale agreement. The Comptroller's power to waive shareholder approval in appropriate circumstances extends to this latter vote requirement. The Report to the Senate makes clear a point somewhat equivocal in the House Report, that it was contemplated that liquidation contracts could be entered into without a prior shareholder approval of liquidation. Indeed this practice was viewed as being sanctioned under pre-existing law and constituted the situation at which the new legislation was directed.

■ In view of this background we do not see how it can be reasonably argued that the instant contract was invalid either because it was executed prior to shareholder approval of liquidation or what reduces itself to the same thing, because the liquidation was not subsequently approved by the necessary two-thirds vote of the shareholders.[8] Assuming for purposes of discussion that the Comptroller's action in waiving shareholder approval of the contract of sale was valid, an issue which we will consider at a subsequent point in this opinion, the executed contract was not open to valid attack. Section 181 when read in the light of its legislative history assumes a situation in which a board of directors first negotiates a purchase and sale agreement in contemplation of a voluntary liquidation. In the usual case a vote of the shareholders owning two-thirds of the stock will be necessary in order to validate the agreement. In an emergency situation in which the Comptroller validly waives the right of shareholder approval of the agreement, the validity of the contract does not depend upon shareholder approval. In either case it is still open to the shareholders by subsequent vote to determine whether they desire a completion of the voluntary liquidation or a continuation of the corporate existence.

■ The 1959 statute resulted from a belief on the part of Congress that shareholders to that time had not had effective control over the execution of bulk sale agreements made in contemplation of liquidation. What seems implicit in this view is a conclusion to the effect that the validity of such an agreement in no way related to or was dependent upon the subsequent receipt of the necessary two-thirds vote of approval of liquidation. If the view of Congress had been to the contrary in this regard, no additional protection of shareholders would have been required inasmuch as dissenting shareholders could just as effectively express their disapproval of a particular contract by means of their vote as to liquidation. Similarly, on this assumption the Comptroller's power of waiver would be substantially meaningless. The validity of purchase and sale contracts entered into in times of emergency with shareholder approval waived, would depend on a subsequent vote in favor of liquidation. Shareholders considering a particular offer undesirable could effectively "kill" the contract by means of their liquidation vote. No better example of this is provided than by the facts of the case at bar. The essential relief requested by the appellants was a declaration of invalidity of the Exeter-Wyoming contract, an injunction forbidding the parties from taking any action under the contract, and an order directing the officers and directors of the Exeter bank to submit to the shareholders for approval all offers presently existing or hereafter obtained for the purchase of the bank's assets. We conclude that the appellants' position is without merit.

■ Appellants finally contend that the Exeter-Wyoming contract was invalid because the Comptroller was without

8. Of course a particular contract for the sale of assets does not come at all within the purview of the 1959 amendment unless it is made in contemplation of liquidation.

power to waive the right of shareholder approval as to it in the present circumstance. The issue posed in the instant context relates to whether or not an emergency existed respecting the Exeter bank within the purview of Section 181. As previously indicated the court below adopted the view that all matters involving the judgment of the Comptroller in the case at bar were within his sole and exclusive discretion, non-reviewable by the court. The complaint was therefore dismissed as against the Comptroller. For reasons stated hereinafter, we are of the view that the court below erred in this regard insofar as its order related to and precluded review respecting the Comptroller's determination of the existence of an emergency. The necessity, we think, for some type or measure of judicial review concerning this determination indicates that the Comptroller must be treated as a necessary if not an indispensable party within the meaning of Rule 19, Fed.R.Civ.P. 28 U.S.C., in the instant case.[9]

The 1959 amendment to Section 181 provides that purchase and sale agreements must be approved by the shareholders owning two-thirds of the bank's stock "unless an emergency exists and the Comptroller of the Currency specifically waives such requirement for shareholder approval." It will be noted that the emergency phrase and the waiver phrase are conjoined. The language employed with respect to emergency is sharply distinguishable from that evidenced in other sections of the national banking statute involving decisions of the Comptroller such as those concerning appointment of a conservator and termination of a conservatorship. Thus Section 203, 12 U.S.C.A., reads in pertinent part: *"Whenever he shall deem it necessary* in order to conserve the assets of any bank for the benefit of the depositors and other creditors thereof, the Comptroller of the Currency may appoint a conservator for such bank and require of him such bond and security *as the Comptroller of the Currency deems proper.* (Emphasis added.)" Section 205, U.S.C.A., quoted supra, concerning termination of a conservatorship contains substantially similar language. See generally 1 Davis, Administrative Law § 4.04 (1958). We cannot consider the differing language in Section 181 to have been employed inadvertently, particularly in view of the fact that the moving force in the enactment of the amendment was a desire on the part of Congress to increase protection for shareholders. To construe the statute as entrusting to the Comptroller a non-reviewable discretion in this area would have the opposite effect, e. g., that of decreasing the safeguards available to shareholders under pre-existing law, in at least one basic respect.[10] We conclude

9. Rule 19 provides in pertinent part: "(a) Necessary Joinder. Subject to the provisions of Rule 23 and of subdivision (b) of this rule, persons having a joint interest shall be made parties and be joined on the same side as plaintiffs or defendants. When a person who should join as a plaintiff refuses to do so, he may be made a defendant or, in proper cases, an involuntary plaintiff.

"(b) Effect of Failure To Join. When persons who are not indispensable, but who ought to be parties if complete relief is to be accorded between those already parties, have not been made parties and are subject to the jurisdiction of the court as to both service of process and venue and can be made parties without depriving the court of jurisdiction of the parties before it, the court shall order them summoned to appear in the action. The court in its discretion may proceed in the action without making such persons parties, if its jurisdiction over them as to either service of process or venue can be acquired only by their consent or voluntary appearance or if, though they are subject to its jurisdiction, their joinder would deprive the court of jurisdiction of the parties before it; but the judgment rendered therein does not affect the rights or liabilities of absent persons."

The distinction between indispensable and necessary parties is immaterial for purposes of the issues raised on this appeal.

10. The broad statement contained in the report of the Senate Committee on Banking and Currency set out in the opinion *supra*, that "existing law does not require shareholder approval of any agree-

that the Comptroller's determination respecting the existence of an emergency is reviewable and that remand is necessary for consideration of the question in the first instance by the court below.

The sole issue that remains for discussion is the test to be applied by the court below on remand. While we have concluded that the Comptroller's determination respecting the existence of an emergency is reviewable, nevertheless it is manifest that the Comptroller is charged with the fundamental power of decision on this question. The standard to be applied is not whether an emergency in fact existed but whether a reasonable man on the basis of facts of which he was aware or should have been aware, could have reasonably concluded that an emergency existed. All matter relevant to a proper consideration of this question will be of course admissible into evidence. The extent if any to which it is proper to specifically define or give some semblance of meaning to the term "emergency" as employed in Section 181, we leave initially to the judgment of the court below after consideration of the facts and the legal arguments presented. In so holding we believe that we have given due consideration to the authorities cited on the brief of the Comptroller and strongly relied on by his counsel in oral argument. We do not find these cases to be apposite here. To so hold would, we think, be contrary to the intent of Congress. See, again, notes 6, 7, and 10, supra, and the text of this opinion to which they are cited.

We have considered the other points raised by the parties and are of the view that none requires discussion.

The order of July 2, 1962, dismissing the complaint as to the Comptroller will be reversed, as also will be the order of July 12, 1963, dismissing the complaint as to the other defendants. The cause will be remanded with the direction to reinstate the Comptroller as a party defendant and to reinstate the complaint as to all the defendants and to take further proceedings consistent with this opinion. Costs will be taxed in favor of the plaintiffs-appellants and against all the defendants-appellees except the Comptroller.

---

ment the directors may make for a bulk sale of bank assets to another bank as a preliminary step to voting the selling bank into voluntary liquidation" is a literal overstatement respecting the pertinent law. Under pre-existing law shareholders were empowered to challenge such agreements as not having been necessary for the protection of creditors. See, e. g., Wannamaker v. Edisto Nat'l Bank, 62 F.2d 696 (4 Cir. 1933); City

Nat'l Bank of Huron v. Fuller, 52 F.2d 870 (8 Cir. 1931). See also the statement set out in note 6 supra. And of course an agreement can always be attacked as being the product of fraud or bad faith. The legislative history of the 1959 amendment leaves no doubt that it was not contemplated that the new enactment effected or was to effect a significant substantive change in the law.