**Albert J. MINICHELLO et al., Plaintiffs,**

**v.**

**James J. SAXON, Comptroller of Currency for the United States of America et al., Defendants.**

**Civ. A. No. 7591.**

United States District Court
M. D. Pennsylvania.

April 7, 1967.

Arthur D. Dalessandro, Wilkes-Barre, Pa., Joseph J. Ustynoski, Hazleton, Pa., Anthony C. Falvello, Hazleton, Pa., for plaintiffs.

Richard S. Beatty, Office of Comptroller of Currency, Washington, D. C., Bernard J. Brown, U. S. Atty., Scranton, Pa., Thomas F. Gill, Wilkes-Barre, Pa., Charles A. Shea, Jr., Wilkes-Barre, Pa., for defendants.

FOLLMER, District Judge.

## MEMORANDUM

This derivative stockholders' action is presently before this Court on Mandate from the Court of Appeals, 3 Cir., 337 F.2d 75. In accordance with the Mandate, this Court by Order of July 14, 1965, reinstated the Comptroller as a party defendant and also reinstated the Complaint as to all defendants.

The Court of Appeals, in further disagreement with this Court, concluded that the Comptroller's determination respecting the existence of an emergency is reviewable and accordingly remand was necessary for consideration of the question in the first instance by this Court.

The Court of Appeals said, inter alia:

"The sole issue that remains for discussion is the test to be applied by the court below on remand. While we have concluded that the Comptroller's determination respecting the existence of an emergency is reviewable, nevertheless it is manifest that the Comptroller is charged with the fundamental power of decision on this question. The standard to be applied is not whether an emergency in fact existed but whether a reasonable man on the basis of facts of which he was aware or should have been aware, could have reasonably concluded that an emergency existed. All matter relevant to a proper consideration of this question will be of course admissible into evidence. The extent if any to which it is proper to specifically define or give some sembance of meaning to the term 'emergency' as employed in Section 181 we leave initially to the judgment of the court below after consideration of the facts and the legal arguments presented. * * * "

In the light of the opinion of the Court of Appeals, we are here charged with the duty of reviewing the action of the Comptroller of the Currency taken

on February 26, 1962, with relation to the First National Bank of Exeter when he stated, inter alia, "I have determined that an emergency exists. * * * " We are not required to determine whether or not an emergency did in fact exist at that time at the Exeter Bank, but whether a reasonable man on the basis of facts of which he was aware or should have been aware, could have reasonably concluded that an emergency existed. "All matter relevant to a proper consideration of this question will be of course admissible into evidence."

In accordance with the said Mandate, the Court set Monday, January 9, 1967, at 10:00 o'clock A.M., at the United States Courthouse, Lewisburg, Pennsylvania, as the time and place to take testimony as directed by said Mandate.

At the hearing, plaintiffs moved to incorporate into the record the testimony taken before the Court in the first hearing, which began June 24, 1963, and various exhibits. Plaintiffs called the attention of the Court to the fact that George Daileda, former Cashier of the Exeter Bank, was deceased and that August Lippi, Chairman of the Board of said bank, had been convicted as to some of the defalcations at this bank. Plaintiffs then rested.

At this point, defendants called Marshall Abrahamson who identified himself as Chief National Bank Examiner in the employ of the Comptroller of the Currency during the month of February, 1962. On questioning by the United States Attorney, who was acting by agreement for all defendants, Mr. Abrahamson testified at considerable length and was cross-examined by counsel for plaintiffs.

Mr. Abrahamson's testimony may be condensed as follows: First National Bank of Exeter was under the jurisdiction of Mr. Abrahamson as a part of the Third Federal Reserve District whose headquarters were in Philadelphia, Pennsylvania. On January 29, 1962, Abrahamson received a call from Ettore J. Lippi, President of the Exeter Bank, that a defalcation existed occasioned by Daileda, the Cashier. Pursuant to that telephone conversation, Abrahamson in his capacity as Chief National Bank Examiner immediately telephoned Examiner Talarsky and sent him to the bank to determine the extent of the defalcation. In addition, Abrahamson arranged to be at the bank the next morning, January 30. With the aid of Talarsky and a group of assistants from the area, Abrahamson practically conducted another investigation of the bank in an effort to determine the exact condition of the bank because by that time they knew the defalcation was large, actually in excess of $200,000.00, and that it probably impaired the capital. At that time the capital structure was about $350,000.00.

Abrahamson was at the bank off and on for the next few weeks during which time the examination of the bank continued without interruption. During all of this time the shortage was increasing daily and by February 26, 1962, it was in the neighborhood of $450,000.00 or $460,000.00. Each new lead would develop further losses. At no time were the examiners satisfied that they had determined the actual extent of the defalcation. The examiners found that the majority of the losses were liabilities not shown on the books of the bank, but rather that funds had been abstracted and the records had been withdrawn by Daileda, so that when the bank's depositors were contacted it was discovered that additional deposits were not shown on the bank books.

The examiners knew there was in existence a primary bond of $200,000.00 and a $1,000,000.00 excess bond. They also knew that the excess bond had not been authorized by the Board of Directors; that it was obtained by the Cashier, Daileda, without the knowledge of the Board; that he could not pay for the bond in the usual way by a Cashier's check charged to expense for the reason that in that event the Board would have knowledge of it; that Daileda falsified the records and paid for it with a Cashier's check with a duplicate number .

and it never did appear in the expense account.

At this point the defendant offered in evidence two letters from Scarborough and Company Insurance Counselors of Chicago, Illinois, to the Exeter Bank. The one letter stated that an investigation was being made by the Underwriters, that the Underwriters admitted no liability under said bond and expressly denied liability thereunder. The second letter stated that since there was a question as to refund due and owing, the funds had been placed in escrow pending advice as to whom refund should be made.

Abrahamson continued that after taking the capital structure of the bank and adding to it the $200,000.00 primary bond and deducting therefrom the known loss and the paper felt to be reasonably uncollectable, there remained slightly less than $100,000.00 funds.

As of February 26, 1962, as the result of the examination, and the fact the examiners could not say with any assurance that the million dollar bond would be paid in the light of the denial of liability, Abrahamson concluded that an emergency existed.[1] He was in constant communication with the Comptroller by telephone during the period from January 30, until the conservatorship was removed. These telephone reports to the Comptroller were almost daily, the frequency varying with the information which was to be submitted.

There were some large withdrawals, one by a director amounting to between $160,000.00 and $167,000.00, which gave them concern and this was one of the factors leading up to placing the bank into conservatorship. In addition, Abrahamson reported to the Comptroller the actions of the Lippi group which constituted a majority of the Board and of this the Comptroller was fully advised.

Abrahamson endeavored to have the Lippi group resign from the Board, but they refused. He testified that he certainly considered that an emergency existed at the bank and he reported this fact to the Comptroller.

Abrahamson repeated that on telephonic inquiry from the Comptroller as to his idea or recommendations as to the existence of an emergency, he replied that in his opinion there was an emergency.

On cross-examination, he testified: "that continued withdrawal of good assets, cash and available funds, to meet withdrawal of deposits could only continue—they would continue and then they would result in a condition existing whereby the bank would have slow assets or uncollectable assets to meet the remaining deposit liabilities. And that's what gave the Comptroller concern." (N.T. pp. 45–46).[2] Abrahamson also testified that although there had been a number of very substantial withdrawals, there had not been a run on the bank in the generally accepted meaning of that term and that at no time including the time the conservator was in power, did the bank lose the confidence of the banking public in Exeter. Then on further cross-examination, there appeared the following:

"BY MR. FALVELLO:

"Q Mr. Abrahamson, while the Conservator was in control of the bank there was no emergency, was there?

"A Oh, yes. The emergency continues. The mere fact that the Conservator is appointed, he merely conserves the assets. He only permitted a percentage withdrawal of deposits within a limitation that he knew would not wreck the bank or cause its insolvency. But the emergency had to continue during this period, or otherwise the Conservatorship would have

1. As to Daileda's fraud vitiating the bond and precluding any recovery thereon, see Gordon v. Continental Casualty Company, 319 Pa. 555, 181 A. 574, 104 A.L.R. 1238 (1935).

2. Unless otherwise designated, "N.T." refers to Notes of Testimony of Hearing of January 9, 1967.

been terminated sooner; because when the emergency is over, there is no need for a Conservator. But you have to say during his entire tenure that there was or is an emergency. He wouldn't be in there otherwise.

\* \* \* \* \* \*

"A Well, I made my recommendation to the Comptroller fearful that this bank could become insolvent; that this is an emergency. The emergency as we are using it here, means that something could happen to this bank that would cause it to become insolvent and force its closing. And we merely took the steps by naming Conservator to tide this thing over until the Board took some action to replenish the capital funds of the bank or until such action that we knew that this million dollar excess bond would be covered, or until the Lippi group would divest themselves because the management was highly questionable. And these all are points in the emergency." (N.T. pp. 50–51.)

Among the exhibits offered in evidence by plaintiffs at the hearing of January 9, 1967, were No. 23, being the audit and verification of accounts of the Exeter Bank as of January 31, 1962, dated April 24, 1962; and No. 22, being the settlement agreement on the excess bond, dated April 24, 1962, neither of which were in existence when the Comptroller exercised his judgment.

The following uncontroverted facts were developed at the hearings:

1. The First National Bank of Exeter was a small community bank. Its capital stock was $75,000.00, it had surplus of $225,000.00 and undivided profits of $51,000.00. (N.T. p. 17.)

2. The defalcation was discovered on January 29, 1962. (N.T. p. 13.)

3. Marshall Abrahamson, Chief National Bank Examiner, with forty years experience, sent Mr. Talarsky, a National Bank Examiner, to the Exeter Bank on January 29, 1962. (N.T. pp. 14, 36.)

4. Mr. Abrahamson arrived at the Exeter Bank on January 30, 1962, and with a team of examiners began an investigation of the bank. (N.T. pp. 14, 15.)

5. On January 30, 1962, the shortage amounted to $200,000.00 and grew steadily until February 26, 1962, when it had reached a figure between $450,000.00 and $460,000.00. (N.T. p. 18.)

6. Between January 30, 1962, and February 26, 1962, Mr. Abrahamson was in constant communication with the Comptroller and reported all facts as they were discovered. (N.T. pp. 32, 33.)

7. Mr. Santarelli, a member of the Board of Directors of the Exeter Bank, withdrew his accounts amounting to between $160,000.00 and $167,000.00 prior to the appointment of the conservator. (N.T. pp. 33, 45.)

8. Other depositors closed their accounts during this period. (N.T. p. 34.)

9. The examination as of February 26, 1962, indicated that there were savings accounts which were not insured by Federal Deposit Insurance Corporation in the amount of approximately $170,000.00. (N.T. p. 36.)

10. The bank had Fidelity Surety bonds covering its officers and employees in the sum of $200,000.00. (N.T. p. 22).

11. There was an excess bond in the sum of $1,000,000.00 on which the company had formally denied liability by letter dated February 19, 1962. (Defendants' Exhibit No. 1.)

12. The examination by the bank examiners revealed that there were a number of loans on the bank books which were considered doubtful and substandard. (N.T. p. 28.)

13. On or about January 30, 1962, the Chairman of the Board of Directors and the former Cashier of the bank were both arrested by agents of the Federal Bureau of Investigation and charged with violations of Title 18 U.S.C. §§ 656, 1005 and 2 in connection with the defalcation at the bank. (N.T. p. 8.)

14. The August Lippi group was in control of the Board of Directors and had

majority control of the Exeter Bank stock. (N.T. pp. 34, 35.)

15. The Comptroller was not satisfied with the Lippi group management and constantly requested them to get off the Board and divest themselves of their stock, but they refused. (N.T. pp. 34, 54).

16. In addition to August Lippi, his son, Ettore Lippi, was a Director and President of the Bank, and his son, John Lippi, was a Director. (N.T. p. 28.)

17. On February 26, 1962, the financial picture of the First National Bank of Exeter was as follows: Assets— capital stock $75,000.00, surplus $225,-000.00, undivided profits $51,000.00, Fidelity Bonds $200,000.00, making a total of $551,000.00. The known defalcation was $460,000.00 and in addition, there were savings accounts not insured by the Federal Deposit Insurance Corporation in the amount of $170,000.00 and there were numerous doubtful and substandard loans.

18. On February 19, 1962, the Comptroller appointed a conservator for the bank. (N.T. p. 41 of Hearing of June 24, 1963.)

19. By letters dated February 19, 1962, the Bonding Company notified the Exeter Bank that it disclaimed liability on the excess bond and that it was seeking information as to the person to whom it should return the purported premium payments. (Defendants' Exhibits Nos. 1 and 2.)

20. It was impossible for anyone to determine what amount the ultimate shortage would reach. (N.T. pp. 21, 22 and N.T. pp. 77, 78 of Hearing of June 24, 1963.)

21. The shortage continued to grow after the conservatorship was terminated. (N.T. p. 39.)

22. During this period, the shortage was not being stated on the bank's books of condition and did not have any effect on the bank's published condition. (N.T. p. 44.)

23. Deposit accounts in excess of $10,000.00 totaled approximately $170,-000.00 which were not protected by Federal Deposit Insurance. (N.T. pp. 35, 36.)

24. Marshall Abrahamson, the Chief National Bank Examiner in charge of the investigation of the Exeter Bank, reported to the Comptroller of the Currency that there only remained slightly less than $100,000.00 in capital funds in the Exeter Bank, that the shortage was continuing to grow, that he was fearful the bank might become insolvent, and that in his opinion, an emergency existed.[3] (N.T. pp. 29–32, 36–38, 51.)

Having in mind the observation of the Court of Appeals that "All matter relevant to a proper consideration of this question [whether a reasonable man on the basis of facts of which he was aware or should have been aware could have reasonably concluded that an emergency existed] will be of course admissible into evidence", the utmost freedom was accorded the parties in presenting their views. Plaintiffs offered no testimony but introduced a few exhibits and the record of the hearing of June 24, 1963. The defendants produced the Chief National Bank Examiner who was appointed by the Comptroller to conduct the examination of the bank.

The following excerpt from letter of April 11, 1962, (plaintiffs' Exhibit No. 18) from the Comptroller to the Chairman of the Committee on Banking and Currency, House of Representatives, Washington, D. C., is here quoted to indicate the thinking of the Comptroller during the developments herein set forth for what light it may throw on the question as to whether a reasonable man could be justified in concluding that an emergency existed at the Exeter Bank:

"As an audit of the bank progressed the amount of the defalcation con-

---

3. It must be remembered that in addition to the facts which the Comptroller knew, he had to assess the possibilities that could occur before exercising his judgment.

tinued to rise to the point where it was obvious that the bank could not be permitted to continue operating although there was doubt as to whether it could be held to be technically insolvent. In light of these facts, plus the failure of the persons involved to work out a satisfactory sale or reorganization of the bank, a serious question as to the liability by the insurer on the bank's umbrella bond, the fact that a receiver may be appointed by the Comptroller only if he is satisfied that the bank is insolvent, etc., there was no alternative but to seek some satisfactory means of conserving the assets of the bank until the full amount of defalcation could be ascertained, the liability or lack of liability of the bonding company could be better established, and there could be determined whether a prompt sale or reorganization of the bank could be accomplished.

"There was reason to believe that the bank could be sold. In spite of its difficulties the bank at no time lost the confidence of the banking public in Exeter, and there was no run nor heavy withdrawals of deposits. A number of sound and well managed banks in the area had expressed an interest in acquiring the bank. Such an acquisition would, of course, insure the continuation of sound, adequate banking service in the community with all deposits immediately available and a minimum of harmful publicity. This would clearly be preferable to receivership even if I had had legal authority to place the bank in receivership. The appropriate and perhaps only way the depositors could be protected until the bank could be sold was through a conservatorship."

I feel that the facts of this case as developed at the hearing fully meet the criteria outlined by the Court of Appeals for determining that an emergency existed.

■■ It seems clear that an emergency exists when imminent danger of insolvency requires one to safeguard the assets in order to prevent the sacrifice of assets when under existing circumstances the value of the assets could only be preserved by prompt action. Insolvency is not the test for the application of 12 U.S.C. § 181.

■ Basically, the Comptroller is charged with the fundamental power of decision on the question of an emergency.

In 29A C.J.S. Emergency, p. 140, it is stated: "It has been said that it is difficult to define an emergency, and that the term is not the subject of an easy or exact definition."

The Court of Appeals said, inter alia: "The extent if any to which it is proper to specifically define or give some semblance of meaning to the term 'emergency' as employed in Section 181, we leave initially to the judgment of the court below after consideration of the facts and the legal arguments presented."

That part of Section 181 applicable to the instant situation provides as follows:

"Any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock. If the liquidation is to be effected in whole or in part through the sale of any of its assets to and the assumption of its deposit liabilities by another bank, the purchase and sale agreement must also be approved by its shareholders owning two-thirds of its stock unless an emergency exists and the Comptroller of the Currency specifically waives such requirement for shareholder approval."

The term "emergency" has been variously defined as follows:

"Any event or occasional combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency:" Cyclopedic Law Dictionary, 3rd Ed. (1940), p. 380.

"An unforeseen combination of circumstances which calls for immediate action:" Webster's Collegiate Dictionary, 5th Ed. (1943), p. 326.

■ It seems clear that the term "emergency" as used in Section 181 providing for the voluntary liquidation of a bank means a combination of circum-

stances less than an insolvency but sufficiently serious to require swift action to negotiate a sale within the terms of Section 181. It would appear further that Section 181 which requires the purchasing bank to assume the deposit liabilities of the selling bank was designed to permit a troubled bank, heading towards a possible insolvency and being in the midst of an emergency, to move swiftly through its directors, to sell its assets to another bank which would give the selling bank's depositors one hundred per cent. protection on all deposits, regardless of size, vis-a-vis, in insolvency and with the appointment of a receiver under Section 191, deposits up to $10,-000.00 only would have been protected by Federal Deposit Insurance Corporation.

After a thorough consideration of all of the facts and legal arguments presented herein, and having in mind that examinations of this bank over a twenty-five year period had failed to disclose any evidence of the defalcations participated in by the bank's Chairman of the Board and its Cashier and that the defalcations remained secret until the Cashier's confession in January, 1962; that the Chief National Bank Examiner, appointed by the Comptroller to conduct the examination, made almost daily reports concerning the constantly increasing shortage; and finally that the bond-ing company's (Security Mutual Casualty Company) disclaimer of liability on the excess bond convinced the Comptroller as a reasonable man that he would have to eliminate the excess bond as a possible asset when he made his assessment of the bank's financial condition on February 26, 1962, the day of the sale, a reasonable man should have concluded that an emergency existed.[4]

█ I conclude that on the basis of facts herein stated, all of which were uncontroverted and concerning which the Comptroller was or should have been aware, the Comptroller could have reasonably concluded that an emergency existed at the First National Bank of Exeter, and that accordingly the Comptroller was beyond question justified in the decision he made under 12 U.S.C. § 181 to waive the requirement of shareholders' approval of the sale to Wyoming National Bank of Wilkes-Barre. Had it not been for the firm and decisive action of the Comptroller, which I have found was fully justified, it is entirely possible that the situation as it existed on February 26, 1962, might have deteriorated and resulted in a very substantial loss to the depositors, other creditors and shareholders of the First National Bank of Exeter.

Accordingly, verdict will be entered for the defendants.

---

4. At the hearing on January 9, 1967, plaintiff offered in evidence "Release and Agreement of Indemnification" between Wyoming National Bank of Wilkes-Barre, Wilkes-Barre, Pennsylvania, and Security Mutual Casualty Company, Chicago, Illinois, dated November 7, 1962. This paper sets forth that under date of February 26, 1962, First National Bank of Exeter transferred all of its assets, including Excess Fidelity Policy dated December 15, 1959, issued by Security to Exeter; that Wyoming had made demand on Security for payment of certain claims and filed proof of loss in the sum of $259,710.22; that on the agreement of Wyoming to indemnify Security for any losses Security might suffer by reason of making payment to Wyoming, it was agreed that Security should pay and Wyoming should accept the sum of $129,-855.11 in full settlement of the claim. It should here be noted that it was on February 26, 1962, that the Comptroller said, "I have determined that an emergency exists", the instant release is dated November 7, 1962. When the Comptroller made his decision, liability was completely denied.