In the Matter of the CONSERVATOR-SHIP OF the WELLSVILLE NATIONAL BANK, WELLSVILLE, PENNSYLVANIA.

Gordon S. Miller and Frances S. Miller, Appellants.

No. 17051.

United States Court of Appeals Third Circuit.

Argued Nov. 19, 1968.

Decided Feb. 17, 1969.

Rehearing Denied March 21, 1969.

**224**

David Harrison, Kramer & Harrison, Philadelphia, Pa. (Samuel Marx, Milton J. Kolansky, Philadelphia, Pa., on the brief), for appellants.

Morton Hollander, Chief, Appellate Section, Civil Division, Dept. of Justice, Washington, D. C. (Edwin L. Weisl, Jr., Asst. Atty. Gen., Bernard J. Brown, U. S. Atty., Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before GANEY, FREEDMAN and SEITZ, Circuit Judges.

OPINION OF THE COURT

GANEY, Circuit Judge.

This is an appeal by two minority stockholders of the Wellsville National Bank ("Bank"), Borough of Wellsville, York County, Pennsylvania, from the denial by the United States District Court for the Middle District of Pennsylvania, of their motion to vacate that court's order of January 28, 1967, approving a proposed agreement between the Conservator of the Bank and the Bank of Hanover and Trust Company ("Hanover") for the sale of all the assets of the Bank in exchange for Hanover's assumption of all the liabilities (other than to the shareholders as such) of the Bank. Hanover is a State banking institution, organized and existing under the laws of Pennsylvania, with its principal place of business in the Borough of Hanover, York County, Pennsylvania.

Pursuant to the power vested in him by the Bank Conservation Act,[1] William B. Camp, the Acting Comptroller of the Currency of the United States, notified Michael C. Kearns, by letter dated January 25, 1967, of his appointment as Conservator for the Bank. The letter stated:

> "You are appointed Conservator of [the Bank], * * * effective 10:30 a. m., January 28, 1967. At that time, you will take charge of the bank but will continue regular banking operations receiving deposits and paying out money in the normal course of business * * *.

> "You are directed, immediately after taking charge, to enter into an agreement with [Hanover] for the sale of all the assets of [the Bank] to [Hanover] in consideration of the assumption by [Hanover] of all the deposits and other obligations and liabilities of [the Bank] (other than liabilities to the shareholders of [the Bank] as such) on terms as a court of record of competent jurisdiction shall direct."[2]

---

1. 48 Stat. 2 (1933), 12 U.S.C.A. § 201 et seq.

2. The letter further directed: "For this purpose you will, immediately after tak-

On January 28, the day his appointment became effective, the Conservator presented a petition to the United States District Court for the Middle District of Pennsylvania, to sell the assets of the conservatorship estate. Accompanying the petition was a copy of the commission appointing Kearns the Conservator of the Bank, the letter of notification, the purchase and assumption agreement and an affidavit of the acting Comptroller. The latter document stated as one of the reasons for appointing the conservator and directing him to sell the assets of the Bank to Hanover was that the Bank was "dangerously close" to insolvency, that the solvency and safety of the Bank have been "seriously impaired" for an extended period of time and that the condition had steadily worsened, and that the existing management could under no circumstances be permitted to continue in control of the Bank.

On that same day, District Judge William J. Nealon, Jr., signed an order approving the purchase and assumption agreement. The order stated the Court had concluded that the agreement was "fair, just, and equitable, and that the sale of the assets of the Conservatorship estate, as contemplated by said agreement, is in the best interests of the Conservatorship estate." The order further provided "that service of a copy of this Order be made upon all stockholders of the Wellsville National Bank by certified mail, return receipt requested, and that said stockholders are given five (5) days from date of service of this Order to object to this Order or show cause why it should be set aside."

On February 6, 1967, Gordon S. Miller, a shareholder of the Bank, and his wife [3]

filed their "Motions to Intervene" and "Motion to Vacate January 28, 1967 Order." On March 15, 1967, the acting Comptroller filed a paper entitled "Opposition to Motion to Vacate and Motion to Intervene", accompanied by his affidavit. This latter document stated, inter alia, that there were three principal problems facing the Bank which led him to conclude that an immediate sale by the conservator of all the assets of the Bank was the best available course for the protection of the banking public and the Bank's depositors, creditors and shareholders. These three problems were (1) the apparent and continuing insolvency of the Bank and all the improper banking practices which had led to insolvency, (2) the continuing inability of those in control of the Bank to raise new capital, and (3) the improper and possible unlawful activities of Gordon S. Miller (one of the objecting minority stockholders) at various times President, Chairman of the Board and principal individual shareholder of the Bank. The fifth paragraph of the affidavit stated: "5. That the regular and special examinations of the Bank conducted since assumption of control by Gordon S. Miller, disclosed continuing difficulties with loans, capital, liquidity and credit culminating in insolvency, none of which could be resolved in the normal course of supervision or in repeated discussions with [the Bank's] directors."

The Millers first contend that the acting Comptroller exceeded his authority when he entered into an agreement of sale to turn over the Bank to a State bank and then appointed a conservator for the purpose of executing the already prepared and signed agreement when the Bank was operating, meeting

---

ing charge, sign in the presence of an attesting witness the proposed agreement already executed on behalf of the Bank of Hanover and Trust Company and notify by telephone the Regional Administrator who will be in the United States Attorney's Office in Scranton, Pennsylvania * * *."

3. The Wellsville National Bank's stock ledger as of January 28, 1967, showed

that Gordon Miller was the owner of 100 shares of the bank's stock (or 10 percent of the shares outstanding) and that his wife, Frances, was not listed as owning any shares either individually or jointly. It also showed that the Bank of Hanover and Trust Company was the owner of 508 shares (or 50.8 percent of the shares outstanding).

all its demands and was not placed in receivership or declared insolvent. Section 203 of the Bank Conservation Act, 12 U.S.C.A. § 203, provides in part: "Whenever he shall deem it necessary in order to conserve the assets of any bank for the benefit of the depositors and other creditors thereof, the Comptroller of the Currency may appoint a conservator for such bank * * *." Under this section, the appointment of a conservator is discretionary on the comptroller's part and is not subject to judicial review. See Davis Trust Co. v. Hardee, 66 App.D.C. 168, 85 F.2d 571, 107 A.L.R. 1425 (1936). Also see discussion in Minichello v. Saxon, 337 F.2d 75, 83 (C.A. 3, 1964), cert. denied, 380 U.S. 952, 85 S.Ct. 1084, 13 L.Ed.2d 969.[4]

Regarding the sale of the assets of a national bank, section 203 further provides: "Such conservator shall have all the rights, powers, and privileges now possessed by or hereafter given receivers of insolvent national banks * * *. During the time that such conservator remains in possession of such bank, the rights of all parties with respect thereto shall, subject to the other provisions of this subchapter, be the same as if a receiver had been appointed therefore. * * *" The powers of a national bank receiver are set forth in sections 16 and 17 of the Act of September 8, 1959, 73 Stat. 458, 12 U.S.C.A. §§ 191 and 192. Section 191, U.S.C.A., in part, provides: "*Whenever * * * the comptroller shall become satisfied of the insolvency of a national banking association,* he may, after due examination of its affairs, in either case, appoint a receiver who shall proceed to close up such association." (Emphasis added.) Section 192, U.S.C.A., states: "On becoming satisfied, as specified in sections 131 and 132 [U.S.C.A.] of this title, that any association has refused to pay its circulating notes as therein mentioned, and is in default, the Comptroller of the Currency may forthwith appoint a receiver, * * * Such receiver, under the direction of the comptroller, shall take possession of the books, records, and assets of every description of such association, collect all debts, dues and claims belonging to it, and, upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct * * *."

■■ It can be said on behalf of the acting Comptroller that the words, "Whenever * * * the comptroller shall become satisfied of the insolvency of a national banking association" appearing in § 191, U.S.C.A., gives him the discretion to make a determination of whether a national bank is insolvent[5] and that such determination is not reviewable by the courts. However, it becomes necessary to discuss both Acts concerning review.

In Minichello v. Saxon, *supra*, 337 F.2d 75, 82–84 (C.A. 3, 1964), a derivative shareholders' action to invalidate a sale of assets of a national bank in which this Court concluded that the comptroller's determination under § 181 U.S.

---

4. On remand, 266 F.Supp. 279 (M.D.Pa. 1967), aff'd per curiam sub nom. Minichello v. Camp, 394 F.2d 715 (C.A. 3, 1968), where this Court said: "Ample evidence to support the conclusion of the [District Court] that the Comptroller could have reasonably found that an emergency existed at the time stated."

5. The National Bank Act and the Bank Conservation Act do not define insolvency. Neither do the regulations of the Comptroller. However insolvency within the meaning of the National Bank Act encompasses both the inability of a bank to meet its obligations as they mature and the closing of its doors. "Its status is [not] determined * * * by the theoretical state of its balance sheet which may include assets whose actual value is far less than that at which they are carried on its books." Smith v. Witherow, 102 F.2d 638, 640 (3 Cir. 1939). And in Commercial National Bank in Shreveport v. Connolly, 176 F.2d 1004, 1005, 1007 (C.A. 5, 1949), the Court noted that a requisite for a bank to be solvent is that it must own assets in an amount at least equal to its liabilities.

C.A., of the National Bank Act, respecting the existence of an emergency so as to obviate the necessity of the approval of a sale of the bank's assets by shareholders owning two-thirds of its stock is reviewable by the courts. However, the court is there construing the 1959 amendment to § 181 which, in no wise, concerns a conservatorship. This section is concerned with the ordinary sale of bank assets and provides that in a purchase or sale of bank stock, "unless an emergency exists and the Comptroller of the Currency specifically waives such requirement for shareholder approval", the necessary two-thirds of the bank's stock is unnecessary. In it, the court points out that the emergency phrase and the waiver phrase are conjoined. The court states: "The language employed with respect to emergency is sharply distinguishable from that evidenced in other sections of the national banking statute involving decisions of the Comptroller such as those concerning appointment of a conservator and termination of a conservatorship." (Page 83) Section 203, 12 U.S.C.A., reads, in part: *"Whenever he shall deem it necessary* in order to conserve the assets of any bank * * the Comptroller of the Currency may appoint a conservator for such bank and require of him such bond and security *as the Comptroller of the Currency deems proper."* (Emphasis added.) The court points out in § 205, U.S.C.A., as how termination of a conservatorship contains substantially similar language and states further: "We cannot consider the differing language in Section 181 to have been employed inadvertently, particularly in view of the fact that the moving force in the enactment of the amendment was a desire on the part of Congress to increase protection for shareholders. To construe the statute as entrusting to the Comptroller a non-reviewable discretion in this area would have the opposite effect, e. g., that of decreasing the safeguards available to shareholders under pre-existing law, in at least one basic

respect," and concludes that the Comptroller's declaration of an emergency under this section is reviewable. It is to be remembered that the Court was construing Section 181 of the National Bank Act. In the instant case, we are construing Section 203 of the Bank Conservation Act, 12 U.S.C.A. In other words, the analogy is to two different and separate situations.

It is submitted that the language in § 191, U.S.C.A., adverted to previously, providing, "Whenever * * * the comptroller shall become satisfied of the insolvency of a national banking association" and § 192, U.S.C.A., adverted to, likewise, heretofore, using the phrase "on becoming satisfied" in connection with the sale by a receiver, denotes a phraseology comparable to Section 203 and thus is not reviewable by virtue of the differentiation in wording of the sections permitting discretion, as pointed out in Minichello v. Saxon, *supra.* However, for reasons hereinafter set forth, we need not reach this question.

While this matter was in the District Court, although they admitted that the capital structure of the Bank was impaired, the Millers did not deny the insolvency of the Bank or offer an affidavit setting forth facts to support a claim that there was no justification for a determination that the Bank was insolvent. True, the first affidavit of the acting Comptroller did not flatly assert that the Bank was insolvent. However, his second affidavit gave "the apparent and continuing insolvency of the Bank and all the improper banking practices which had led to insolvency" as one of the reasons for concluding that a sale of all the assets of the Bank was the best available course for the Bank's depositors, creditors and shareholders. Even though their motions were filed some thirty-seven days before the second affidavit, the Millers had a period of six months in which to take some action that might have caused the District Court to grant them a hearing on that issue.[6] Un-

---

6. The date of the District Court's memorandum denying the Millers' motions was September 19, 1967.

**228**

der the circumstances, the accepting of the allegations of the second affidavit as being true was within the discretion of the District Court.[7]

■ There having been no dispute before the District Court that there was no basis for the acting Comptroller's satisfaction as to the insolvency of the Bank, its order approving the sale on such terms as it should direct is conclusive upon us and is not subject to attack except for fraud. See Griggs v. Baumer, 130 F.2d 899 (3 Cir. 1942). Accord: In Matter of Receivership of Home National Bank of Ellenville, 147 F.Supp. 389 (S.D.N.Y.1956). But if the order were appealable, we would be of the view that the District Court did not abuse its discretion since the only matter in the record which could possibly make this order reviewable is the refusal of the court to act favorably to the letter of February 6, 1967, addressed to the board of directors of the Bank from a person claiming to represent "a group of prominent citizens", whose names were not mentioned, "willing and able" to purchase the Bank. We are not aware of any rule requiring a court of record to establish the unavailability of alternative solutions to the sale of a national bank to a buyer designated by the comptroller.

■ The final contention of Miller is that the action of the acting Comptroller is a taking of his property without due process of law and without just compensation is without substance. In Smith v. Witherow, 102 F.2d 638, 641 (1939), this Court said: " * * * The original subscriber and all vendees of his shares, upon assuming the status of a stockholder, assume it subject to the conditions and burdens imposed by the

statute as incident to the holding of national bank shares. Pufahl v. Estate of Parks, 299 U.S. 217, 57 S.Ct. 151, 81 L. Ed. 133. * * *"

Accordingly, the appeal will be dismissed.

7. In a case where a majority stockholder brought suit to oust a receiver of a bank in the District of Columbia, appointed by the Comptroller who determined that the bank was insolvent on his appraisal of the value of its securities, the Court of Appeals for the District of Columbia noted: "It has been held by a long array of authorities that where the Comptroller of the Currency has held a bank to be insolvent and has appointed a receiver for it, the court will not substitute its judgment for the judgment of the Comptroller, *unless it appears by convincing proof that the Comptroller's action is plainly arbitrary*, and made in bad faith." (Emphasis added.) See United States Saving Bank v. Morgenthau, 66 App. D.C. 234, 85 F.2d 811, 814 (1936), cert. denied, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446, rehear. denied, 301 U.S. 666, 57 S.Ct. 793, 81 L.Ed. 1365.